UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK SMITH,

      Plaintiff,                Civil Action No. 15-11172

          v.                District Judge Matthew F. Leitman
                          Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Derrick Smith ("Plaintiff) brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") cessation of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

This case has a tangled procedural history. On October 17, 2000, Plaintiff applied for DIB and SSI, alleging disability as of June 1, 2000 (Tr. 836).

-1-

### Original Administrative Finding

On September 20, 2001, Administrative Law Judge ("ALJ") E. Patrick Golden found that Plaintiff was disabled as of June 1, 2000 due to cancer of the lower left extremity, a history of tuberculosis exposure, and "traits of sickle cell anemia" (Tr. 836-838).

### A Finding of Medical Improvement

On March 13, 2006, the SSA found that due to a medical improvement, Plaintiff was no longer disabled (Tr. 40). Plaintiff appealed the finding of non-disability (Tr. 76). On January 15, 2009, ALJ Richard L. Sasnena issued a paritally favorable decision, finding that Plaintiff was not disabled from March 1, 2006 through December 13, 2006; disabled from December 13, 2006 through May 11, 2008; and again, not disabled from May 11, 2008 through the date of the decision (Tr. 106-108).

### The First Appeals Council Remand

On Setember 4, 2009, the Appeals Council remanded the case for further fact-finding on the basis that ALJ Sasnena failed to provide an adequate rationale for finding that Plaintiff had a renewed disability as of December 13, 2006 but became non-disabled as of May 11, 2008 (Tr. 114). The Appeals Council also found that the ALJ had failed to reconcile the non-treating medical findings that Plaintiff could perform exertionally light work[1] with

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that

-2-

the Residual Functional Capacity ("RFC") for a limited range of sedentary work (for the period of non-disability) found in the administrative opinion (Tr. 104, 114). The Appeals Council found further that the ALJ failed to evaluate Plaintiff's subjective allegations of pain and neglected to inquire as to the source of the Vocational Expert's testimony (Tr. 114). On December 8, 2010, ALJ Myriam C. Fernandez Rice presided at the rehearing, and on April 22, 2011, found that Plaintiff's disability ended on March 1, 2006 (Tr. 173-186).

**The Second Appeals Council Remand**

On July 2, 2012, the Appeals Council once again remanded the case for further fact-finding, this time to obtain more recent evidence regarding Plaintiff's back and foot conditions, provide adequate reasons for rejecting a treating source opinion, and provide a more thorough rationale for the RFC (Tr. 197-199). On October 30, 2015, ALJ John Rabaut presided at Plaintiff's fourth administrative hearing (Tr. 739). Plaintiff, represented by non-attorney Belinda Cooper of the Legal Aid & Defender Association ("LAD"), testified (Tr. 744-757), as did Vocational Expert ("VE") Harry Cynowa (Tr. 757-765).

Before issuing a decision, ALJ Rabaut ordered a post-hearing consultative examination, performed on November 30, 2012 (Tr. 377-391, 392). On December 20, 2012, ALJ Rabaut sent a proffer letter to both Plaintiff and representative Belinda Cooper, stating

---

exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

that Plaintiff could request a supplemental hearing based on the new evidence (Tr. 392-393).

ALJ Rabaut indicated that if he did not hear from Plaintiff or Cooper in 10 days, he would

enter the consultative findings into the record and issue a decision (Tr. 393). Plaintiff did not

request a supplemental hearing or otherwise respond to the December 20, 2012 letter.[2]  On

March 5, 2013, ALJ Rabaut found that Plaintiff experienced a medical improvement as of

March 1, 2006 and was not disabled from that date through the date of the decision (Tr. 22-

33).

On January 30, 2015, the Appeals Council denied review (Tr. 9-13).  Plaintiff filed

the present action on March 27, 2015.

## BACKGROUND FACTS

Plaintiff, born July 17, 1963, was 42 at the time of the March 1, 2006 finding of

medical improvement by the SSA (Tr. 31).  He completed 12th grade and worked previously

as a kitchen helper and home care attendant (Tr. 757).  He alleges ongoing disability due to

lower extremity and back problems caused by the July, 2000 removal of a tumor from his left

foot (Tr. 29).

### A.  Plaintiff's Testimony (October 30, 2012)

Plaintiff offered the following testimony.

He lived in an apartment in Detroit, Michigan (Tr. 743).  His inability to procure

---

[2]Plaintiff's current counsel disputes that either Plaintiff or then representative
Cooper ever received a copy of the December 29, 2012 letter.

recent treatment for his back condition was due to his lack of insurance (Tr. 744).  He received ongoing treatment for his foot condition (Tr. 744).  He took Vicodin for back pain, which was dispensed by emergency room treaters (Tr. 745).  His back problems were caused by left foot instability (Tr. 745).  He currently experienced a lump on the side of his foot that required a biopsy (Tr. 747).  His foot condition was his "biggest concern" (Tr. 747).

*The ALJ interjected that Plaintiff either had a sedentary RFC or was unable to work* (Tr. 747).  *He stated that he would refer Plaintiff for a consultative examination, noting that the presence of an "open sore" on the foot could "be enough to meet a listing . . ."* (Tr. 748). *The ALJ stated that he wanted "to see how bad the lesion was based on the consultative exams report . . ."* (Tr. 748).

Plaintiff then resumed his testimony.

He grocery shopped with the use of a motorized cart (Tr. 750).  He attended church occasionally (Tr. 751).  He spent his days watching television (Tr. 751).  His ability to carry varied with his degree of pain (Tr. 751).  He experienced sleep disturbances resulting from pain (Tr. 751).  He did not drive and relied on friends and family for transportation (Tr. 752).

In response to questioning by his representative, Plaintiff testified that he suffered from back pain for the past two to three years (Tr. 752).  He reiterated that the back problems stemmed from the left foot problems (Tr. 753).  Plaintiff reported that he needed to keep his left foot elevated (Tr. 754).  Over-the-counter pain medication did not relieve the foot pain (Tr. 754).  On a scale of one to ten, his pain level, at best, was a "four" (Tr. 755).

### B.  Medical Evidence

### 1.  Records Created Prior to the Alleged Medical Improvement of March 1, 2006[3]

In the June and July, 2000 surgical procedures, Plaintiff underwent the removal of a low grade sarcoma of the left foot (Tr. 410, 426, 432, 451).  A CT of the thorax was negative for enlarged lymph nodes (Tr. 407).  The same month, Plaintiff underwent a skin graft of the left foot (Tr. 415-417).  Treating notes from the same month state that the graft was healing "relatively well" (Tr. 457).  Plaintiff underwent radiation therapy in November and December, 2000 (Tr. 492).  June, 2001 records note no tumor recurrence but "inflammatory changes related to radiation therapy" (Tr. 535).  A July 24, 2000 examination revealed a small open wound but no infection (Tr. 494).

### 2.  Treating Sources

A November, 2005 ultrasound of the scrotum showed unremarkable results (Tr. 512).  The same month, Plaintiff reported balance problems and back pain as a result of the foot condition (Tr. 548).  In December, 2006, Plaintiff reported left foot calluses and pain (Tr. 551).  January, 2008 laboratory testing showed a renewed infection of the left foot (Tr. 573).  In April, 2007, Stanley B. Cohen, D.P.M. noted that Plaintiff reported improvement following a debridement procedure (Tr. (Tr. 566-567).  Dr. Cohen ordered orthotic biomechanical insoles at Plaintiff's request (Tr. 567). Plaintiff reported good results from a

---

[3]Records pertaining to Plaintiff's condition prior to the alleged medical improvement as of March 1, 2006 are included for background purposes only.

June, 2007 debridement procedure (Tr. 565).  The following month, Dr. Cohen noted that a recent skin graft was unsuccessful due to Plaintiff's "excessive ambulation" (Tr. 562).  Notes from later the same month state that a post-grafting procedure was successful (Tr. 561).  Plaintiff underwent a more aggressive debridement procedure the following month (Tr. 559).  A November, 2007 exam was negative for infection (Tr. 556).  In March and May, 2008, Dr. Cohen noted that Plaintiff required additional treatment after failing to comply with medical direction but that the foot condition had nonetheless improved (Tr. 576-577, 580).  November, 2008 records note a recurrent ulceration (Tr. 588).

June, 2009 imaging studies showed a right testicle mass (Tr. 583).  In December, 2010 and January, 2011, Dr. Cohen noted that Plaintiff, currently working at a hospital, was scheduled for a bunionectomy (Tr. 585, 590).  He found that Plaintiff was "unable to sustain increased walking or ambulation activity" (Tr. 585, 590).

July, 2012 treating records by Harry A. Kezehan, D.P.M. note that Plaintiff experienced an open foot wound (Tr. 593).  Treating notes include comment that Plaintiff "states he works as a contractor" (Tr. 593-594).

### 3.  Non-Treating Sources

In October, 2005, Anjum Sadiq, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report of left foot pain and the need for a cane (Tr. 508-509).  Dr. Sadiq observed full muscle strength and normal coordination (Tr. 509).  He found that Plaintiff was unable to squat (Tr. 509).  Dr. Sadiq determined that Plaintiff did not require

-7-

the use of a cane (Tr. 509).  In December, 2005, Sai R. Nimmagadda, M.D. reviewed the medical records on behalf of the SSA, finding that Plaintiff was capable of exertionally light work (Tr. 516-18).  Dr. Nimmagadda found that Plaintiff was limited to occasional climbing and frequent blancing, stooping, kneeling, crouching, and crawling (Tr. 519).  In July, 2006, a second physician performed a non-examining review of the records on behalf of the SSA, making identical findings to the December, 2005 review with the exception of his finding that Plaintiff was limited to *occasional* balancing (Tr. 528).

In November, 2012 Katherine H. Karo, D.O. examined Plaintiff at the request of ALJ Rabaut (Tr. 377-390).  She noted Plaintiff's report of left foot problems since being diagnosed with left foot melanoma in 2000 (Tr. 277).  Plaintiff reported a current infection at the incision site and that the foot problems and weight gain caused back problems (Tr. 377).  He stated that he could sit or stand for 45 minutes and walk for 45 minutes with the use of a cane (Tr. 377).  Plaintiff acknowledged that he was independent with basic and advanced activities of daily living (Tr. 378).

Dr. Karo found the absence of edema, normal muscle tone, and full muscle strength in all extremities (Tr. 378).  Range of motion studies were unremarkable except for a limited range of lumbar spine and left ankle motion (Tr. 379, 383-384).  Dr. Karo found that bending, stooping, carrying, pushing, and pulling were limited due to ankle limitations and the need for a cane (Tr. 379).  Imaging studies of the lumbar spine were unremarkable (Tr. 380).  Imaging studies of the left foot showed degenerative changes at the first

-8-

metatarsophalangeal joint but no other abnormalities (Tr. 380).

Dr. Karo also completed a medical source statement of Plaintiff's work-related activities, finding that he could lift or carry up to 50 pounds occasionally (Tr. 385). She found that Plaintiff could sit, stand, or walk for up to 45 minutes at a time and could sit for a total of four hours a day, stand for three, and walk for one (Tr. 386). She found that Plaintiff required the use of a cane (Tr. 386). She found that Plaintiff did not experience any manipulative limitations but was precluded from all postural activities and all unusual environmental conditions (Tr. 387-389).

### 4. Evidence Submitted After ALJ Rabaut's March 5, 2013 Decision

In February, 2011, Plaintiff sought emergency treatment for ongoing left side pain (Tr. 609). Plaintiff noted that the pain became worse after he drank pop (Tr. 614). Plaintiff exhibited a normal range of motion and normal gait but reported lower left back pain (Tr. 615, 625). He reported improvement in back pain after taking Norco (Tr. 616). In April, 2012, Plaintiff sought emergency treatment for a right leg cyst (Tr. 649). He denied other complaints (Tr. 656). Plaintiff was observed walking "without gait disturbance (Tr. 673). Treating staff found no active infection but upon discharge, provided antibiotics and Norco (Tr. 657). Dr. Kezehan's July, 2012 examination notes duplicate records reviewed by the ALJ (Tr. 640 *see* Tr. 593-594).

In April, 2013, Plaintiff sought emergency treatment for flank pain (Tr. 772). He denied skin problems (Tr. 774). He exhibited a normal range of motion (Tr. 778). He was

diagnosed with an upper respiratory tract infection (Tr. 779). He was observed walking "without gait disturbance" (Tr. 793). November, 2013 treating records state that Plaintiff experienced a renewed foot ulceration with infection in July, 2013 but that the condition had resolved with antibiotics and topical treatment (Tr. 810, 814).

### C. Vocational Expert Testimony (October 30, 2012)

VE Harry Cynowa classified Plaintiff's past relevant work as a kitchen helper as unskilled and exertionally medium and work as a home care attendant as semiskilled/very heavy (Tr. 757). *Plaintiff interjected that he worked full-time sorting laundry at a hospital for 14 months starting in 2008, but stopped after he began experiencing renewed foot problems* (Tr. 758). The VE classified the laundry work as unskilled at the medium exertional level (Tr. 758). The ALJ posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and past relevant work:

> 20 pounds occasionally, stand or walk approximately two hours in an eight-hour day, sit approximately six hours in an eight hour day, no operation of foot controls on the left, no climbing ladders, ropes or scaffolds only occasionally climbing ramps or stairs, only occasional balance, stoop, crouch, kneel and crawl, the ability to utilize a hand held assistive device for prolonged ambulation or over uneven terrain, avoiding concentrated use of moving machinery. Obviously that's going to be affected by the no operation of foot controls on the left, avoiding all exposure of unprotected heights. Could such an individual do any of that past work? (Tr. 759-760).

The VE testified that given the above limitations, the individual would be unable to perform Plaintiff's past relevant work, but with a sit/stand option, could perform the light, unskilled work of a hand packager (2,500 positions in the regional economy); small products assembler

(2,500); and visual inspector/checker (1,000) (Tr. 760-761).  The VE testified further that if

the above-limited individual were restricted to sedentary work, he could perform the work

of a bench assembler (3,250); hand packager (3,250); and security monitor (1,500) (Tr. 761).

The VE stated that if the same individual were required to elevate his left leg to waist level

for more than 20 percent of the day, no work would be available (Tr. 762).  The ALJ

acknowledged that if the same individual were off task for more than 20 percent of the day

due to pain, all work would be precluded (Tr. 764-765).

### D.     The ALJ's Decision (March 5, 2013)

Citing the medical records, ALJ Rabaut found that at the "comparison point decision"

("CPD") of September 20, 2001, Plaintiff was found disabled due to cancer of the left lower

extremity (Tr. 24).  ALJ Rabaut found that as of March 1, 2006, Plaintiff's disability ended

(Tr. 24).   The ALJ found that as of then, Plaintiff experienced the severe impairments of

"history of carcinoma in the lower extremity, status post radiation and skin graft; recurrent

foot ulceration; and obesity," but that none of the conditions met or equaled any impairment

listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 25).  The ALJ found that  as of March

1, 2006, Plaintiff  retained the RFC for sedentary work with the following additional

limitations:

> [A]void operation of foot controls on the left and avoid climbing ladders,
> ropes, and scaffolds.  The claimant can only occasionally climb ramps/stairs,
> balance, stoop, crouch, kneel, and crawl.  The claimant also requires jobs that
> can [be] performed while using a hand-held assistive device only for uneven
> terrain or prolonged ambulation but the contralataral upper extremity can be
> used to lift/carry up to the exertional limits.   The work cannot involve

concentrated exposure to moving machinery and all exposure to unprotected heights (Tr. 27).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of bench assembler, hand packager, and security manager (Tr. 32).

The ALJ discounted Plaintiff's allegations of continued disability (Tr. 27-31). He noted that Plaintiff did not "seek or receive" any treatment for foot problems between October, 2001 and December, 2006 (Tr. 27). He found that Plaintiff's ability to work full time "at very heavy exertion levels" between November, 2008 and December, 2010 undermined the disability claim (Tr. 28). The ALJ cited July, 2012 treating records showing current work as a contractor (Tr. 29). The ALJ accorded Dr. Karo's November 30, 2012 consultative findings "significant weight" to the extent that her findings were supported by the treating records (Tr. 30). However, he found that Dr. Karo's preclusion on all postural activities was not supported by her own findings (Tr. 30).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

-12-

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*,  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR CESSATION OF BENEFITS CLAIMS

In determining whether an individual continues to be disabled, the ALJ employs a eight-step sequential analysis in regard to DIB claims and a seven-step analysis for SSI. See 20 C.F.R. § § 404.1594, 416.994.  In regard to DIB claims, at Step One, the ALJ determines whether the individual is engaging in substantial gainful activity.  A finding that the claimant is performing substantial gainful activity results in a finding of non-disability.  At Step Two the ALJ considers whether the individual had an impairment or combination of impairments which meets or equals the severity of a listed impairment.  If the ALJ finds such impairment(s), the inquiry continues. At Step Three, the ALJ determines whether there has been medical improvement. At Step Four, the ALJ considers whether  the medical improvement relates to the individual's ability to perform work.  At Step Five, the ALJ determines if there has been no medical improvement or the medical improvement is not

-13-

related to the individual's ability to perform work.  At Step Six, the ALJ determines whether the individual's current impairments are severe.   The absence of a severe impairment directs a non-disability finding. At Step Seven, the ALJ determines whether the claimant's abilities allow him to perform his past relevant work.   A finding that he can perform such work results in a non-disability finding.  At Step Eight, the ALJ determines whether the individual can perform other work in light of his age, education, work experience and RFC. A finding that he is capable of performing other work results in a non-disability finding.   Steps two through eight of a DIB claim are identical to the seven-step process used in SSI claims.  *See* § § 404.1594, 416.994.

In contrast to an initial disability determination, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy v. Astrue,* 247 Fed.Appx. 761, 765, 2007 WL 2669153, *4 (6th Cir. September 7, 2007)(*citing Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir.1991)).   In a cessation of benefits case, "the central question is whether the claimant's medical impairments have improved to the point where [s/he] is able to perform substantial gainful activity." *Kennedy* at 764; 42 U.S.C. § 423(f)(1).   A "medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement must be supported by an improvement "in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.*; *Kennedy* at 765.

-14-

## ANALYSIS

### A. HALLEX

Plaintiff first argument pertains to Dr. Karo's post-hearing November 30, 2012 consultative examination.  He claims that neither he nor  representative Cooper received a copy of the consultative examination results or ALJ Rabaut's December 20, 2012 "proffer" letter allowing Plaintiff to request a supplemental hearing based on the post-hearing examination.  *Plaintiff's Brief,* 11-16, *Docket #25*; (Tr. 392).  He relies on *Gaines v. CSS,* 2013 WL 4494966, *8-9 (E.D. Tenn. August 20, 2013), in which the court found that the ALJ's failure to provide the claimant with an opportunity to comment on post-hearing evidence did not comply with the requirements of SSA's Hearings, Appeal and Litigation Manual ("HALLEX") and further, constituted a due process violation.

Due process under the Fifth Amendment "requires that a social security hearing be 'full and fair.' " *Flatford v. Chater,* 93 F.3d 1296, 1305 (6th Cir.1996)(*citing Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  In determining whether a claimant received due process, the courts consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Flatford,* 93 F.3d at 1306; *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Under HALLEX guidelines, the ALJ proffers post-hearing evidence "by sending a letter to the claimant and appointed representative" providing an opportunity, with time limits (1) "to object to comment on, or refute" the newer evidence, (2) submit questions in writing to the author of the proffered evidence, (3) "request a supplemental hearing, including the opportunity to cross-examine the author(s) of any posthearing evidence" and, (4) request a subpoena for the attendance of witnesses or submission of records.  HALLEX I-2-7-30.

While the court in *Gaines* appeared to equate a HALLEX violation with a due process violation, at least under the facts of that case, that view has not been accepted by either the Sixth Circuit of other district courts within the Sixth Circuit. "'No circuit has held that the HALLEX creates constitutional rights because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights.'" *Dukes v. Commissioner of Social Sec.,* 2011 WL 4374557, *9 (W.D.Mich. September 19, 2011)(citing *Davenport v. Astrue,* 417 Fed.Appx. 544, 547–48 (7th Cir.2011)). "[W]hile the HALLEX procedures are binding on the Social Security Administration, they are not binding on courts reviewing the administration's proceedings. *Id.* (*citing Bowie v. Commissioner of Social Security,* 539 F.3d 395, 399 (6th Cir.2008))(same).

For reasons discussed below, the record supports the Plaintiff's claim that neither he nor his representative received a copy of the ALJ's proffer letter and Dr. Karo's report, and

therefore, there was, at a minimum, a HALLEX violation. Nevertheless, it is not necessary to consider the interplay between HALLEX and the due process clause in this case, because regardless of whether the error flowed from the SSA regulations or the constitution, it was harmless.

"The common law has long recognized a presumption that an item properly mailed was received by the addressee." *In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985)(*citing Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932)). However, the "presumption is rebutted 'upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact.'" *Id.* (*citing* 10 Moore's Federal Practice § 301.04[2] (2d ed.)). "Testimony of non-receipt, standing alone, would be sufficient to support a finding of non-receipt; such testimony is therefore sufficient to rebut the presumption of receipt." *Id.*

In support of the contention that the proffer letter was not received, Plaintiff's counsel has provided evidence showing that incoming LAD mail is customarily date-stamped when received. *Plaintiff's Exhibits A-B.* She has also provided representative Cooper's case notes between October, 2012 and February, 2013 which do not mention a December 20, 2012 letter from ALJ Rabaut. *Id., Exhibit C.* And post-oral argument, counsel submitted Plaintiff's own affidavit stating that he did not receive either the proffer letter or the medical report. [Doc. #37]. It is significant that Cooper's case notes, which otherwise set forth the nature of Plaintiff's inquiries about the status of his case, do not mention the proffer letter or the post-

-17-

hearing medical report. Given the importance of those documents, it would be expected that either Plaintiff or his representative would specifically address them in their communications. That they did not supports Plaintiff's affidavit and lends credence to the claim that neither one of them received the mailings from the Commissioner. I find that he has rebutted the presumption of receipt. As such, there was a HALLEX violation.

However, Plaintiff has not demonstrated how he was prejudiced by the violation, and on this record, I find that the error was harmless. The ALJ adopted Dr. Karo's finding that Plaintiff was limited to sedentary work, as opposed to an earlier and broader consultative finding that he could perform light work (Tr. 30). This finding was beneficial, not detrimental to the Plaintiff.[4] The ALJ declined to adopt Dr. Karo's report only to the extent that her finding of extreme postural and environmental limitations were contradicted by both Plaintiff's acknowledged daily activities and the treating records (Tr. 30).

The RFC crafted by the ALJ otherwise also reflects a fair reading of the record. As

---

[4] The ALJ's finding that Plaintiff was capable of sedentary rather than light work substantially impacts a future application for benefits. Under Medical–Vocational Rule 201.14, an individual closely approaching advanced age with Plaintiff's educational background, no transferrable skills, and a limitation to sedentary work generally directs a finding of disability. 20 C.F.R. part 404, subpart P, App. 2. "Individuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." *Id.* Plaintiff, a few months short of his 50th birthday at the time of the decision, would therefore be eligible for benefits if he chose to reapply. At oral argument, counsel indicated that Plaintiff had in fact reapplied and was awarded benefits prospectively from his 50th birthday.

the ALJ noted, Plaintiff's claim of ongoing disability is undermined by his ability to perform full-time work between 2008 and 2010 and July, 2012 records indicating that he was currently working as a contractor (Tr. 29, 593-594). While Plaintiff alleged chronic foot problems, the record shows that he did not receive treatment for years at a time, suggesting isolated rather than occasional or frequent exacerbations of the condition. Although the ALJ credited Plaintiff's claim that he required a cane, the more recent sources observed a normal gait (Tr. 615, 625, 673).

Again, the ALJ accepted, in large part, portions of Dr. Karo's report that were beneficial to the Plaintiff, and rejected the part that was overwhelmingly contradicted by the medical records. Plaintiff has not explained what efficacious actions he could have taken, had he received the report, to effect a different outcome. Because Plaintiff has failed to show "an erroneous deprivation of such interest through the procedures used" or that "additional or substitute procedural safeguards" would result in a more favorable determination, a remand is not warranted.

## B. Disability Under the Listings

Plaintiff also faults the ALJ's finding that he did not meet or equal a listed impairment. He acknowledges that the ALJ mentioned Listings 13.03, 13.04, and 13.11 but argues that the finding is "devoid of any reasons or analysis." *Plaintiff's Brief* at 16-17. He cites *Reynolds v. CSS,* 424 Fed. Appx 411, 418, 2011 WL 1228165, *4 (6th Cir. April 1, 2011) in which the Court found that remand was appropropriate where the ALJ failed to

2015-cv-11172-MFL-RSW   Doc # 38   Filed 07/15/16   Pg 20 of 25   Pg ID 1032

explain his finding that the claimant did not meet a Listing.  Plaintiff argues further that the

ALJ erred by failing to even consider Listings 8.04 (infections of the skin) or 1.08 (soft tissue

injury).  *Plaintiff's Brief* at 18-21, 21.

 "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations,

describes impairments the SSA considers to be 'severe enough to prevent an individual from

doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.*

(citing 20 C.F.R. § 404.1525(a)).  While "[t]he Sixth Circuit 'does not require a heightened

articulation standard from the ALJ" when determining whether a claimant meets a Listing,

*Grohoske v. Comm'r of Soc. Sec.,* 2012 WL 2931400, *3 (N.D.Ohio, July 18, 2012)," it "has

made clear" that articulating the reasons for the finding "is both a procedural and substantive

requirement, necessary in order to facilitate effective and meaningful judicial review.'" *Brock*

*v. Colvin,* 125 F.Supp.3d 671, 672 (N.D.Ohio, 2015)(*citing Reynolds,* 424 Fed.Appx. at 414).

Nonetheless, the Court may "overlook the ALJ's failure to articulate his Step Three findings"

if the error is found to be "harmless in nature." *M.G. v. Comm'r of Soc. Sec.,* 861 F.Supp.2d

846, 859 (E.D.Mich.2012).

### 1.  Listings 13.03, 13.04, 13.11

To meet Listing 13.03 (Cancer of the Skin) requires A. sarcoma or carcinoma "with

metastases to or beyond the regional lymph nodes," or, B. "carcinoma invading deep

extradermal structures (for example, skeletal muscle, cartilage, or bone)." 20 C.F.R. Pt. 404,

Subpt. P, App. 1  § 13.03.   Plaintiff points out that the one-sentence statement that he did

-20-

not meet a listing is unaccompanied by a rationale for the finding.  However, in the next section, the ALJ noted that a June, 2001 MRI was negative for tumor regrowth (Tr. 26).  The ALJ noted further that an October, 2005 consultative examination reevaluating the disability claim showed "a well-healed scar on the sole of the left foot" and "no redness, tenderness, warmth, or effusion" (Tr. 26).  Although the ALJ rationale does not directly follow the "Listings" determination, he nonetheless provided an adequate basis for his finding.  *See Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411,  (6th Cir. January 31, 2006)(insufficiently articulated Step Three finding can be cured by a discussion of the evidence supporting non-disability at earlier or subsequent steps in the sequential analysis).  Further, none of the evidence supports or even suggests a recurrence of the sarcoma later than 2001.  The ALJ noted that a June, 2001 MRI of the left foot showed no evidence of tumor recurrence and that Plaintiff did not seek any treatment of the foot between October, 2001 and December, 2006 (Tr. 26-27, 576-577).  For the same reasons, the ALJ's finding that Plaintiff did not meet Listing 13.04 (soft tissue sarcoma) requiring A. "regional or distant metastasis" or B. "persistent or recurrent following initial anticancer therapy" is well supported and adequately explained. § 13.04.  None of the records subsequent to the July, 2000 surgery indicate that the sarcoma returned.  For the same reasons, Listing 13.11 (Skeletal system—sarcoma) requiring A. "inoperable or unrespectable," sarcoma; B. "recurrent cancer (except local recurrence) after initial anticancer therapy;" C. sarcoma "with distant metastasis;" or, D. "all other cancers originating in bone with multimodal anticancer therapy" are all inapplicable

-21-

to Plaintiff's condition as of March 1, 2006.

### 2. Listing 8.04

Plaintiff's argument that the ALJ ought to have considered Listing 8.04 is not well taken. Listing 8.04, involving "chronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed," appears at least superficially to address Plaintiff's episodes of foot ulceration. However, under the Listing, Plaintiff must show A. skin lesions interfering with joint motion which "very seriously limit use of more than one extremity" consisting of "two upper extremities, two lower extremities, or one upper and one lower extremity;" B. "lesions on the palms of both hands that very seriously limit [the] ability to do fine and gross motor movements;" or, C. "lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit [the] ability to ambulate." § 8.00(C)(1). At most, Plaintiff's intermittent left foot skin problems affect one, not two extremities. Plaintiff does not allege that the condition affects his palms or otherwise prevents him from manipulative activities. Further, Plaintiff's lesions occur exclusively on his left foot, not both feet.

### 3. Listing 1.08

The ALJ likewise did not err in declining to consider Listing 1.08. Listing 1.08 reads as follows:

> Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M,

-22-

> directed toward the salvage or restoration of major function, and such major
> function was not restored or expected to be restored within 12 months of onset.

Listing 1.00M defines "continuing surgical management," as "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." "Surgical management" may include factors such as "post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy."

However, the ALJ noted, Plaintiff's claim that he was under continuing "surgical management" is undermined by his lack of foot treatment from October, 2001 to December, 2006, December, 2006 to April, 2007, November, 2008 to December, 2010, and December, 2010 to July, 2012 (Tr. 27-28). Plaintiff's argument that the sporadic treatment was necessary to restore a "major function" appears to refer to his ability to walk. Yet, to establish "ineffective ambulation," a claimant must show "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." In contrast, Plaintiff alleges at most that he needs the use of a cane requiring the use of only one hand. None of the treating or consultative records suggest that he required he required an assistive device requiring the use of both hands.

The SSA regulations "do not require the ALJ to address every listing . . . ." *Sheeks v. Commissioner of Social Sec. Admin.*, 544 Fed.Appx. 639, 641 (6th Cir. November 20,

2013). "There are a hundred or so listings. In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet . . ." *Id.* While Plaintiff's current counsel has scoured the Listings for a basis for remand, the ALJ did not err in omitting mention of Listings that Plaintiff clearly could not meet or equal.

Based on a review of this record as a whole, the ALJ's decision is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, *Mullen v. Bowen*, *supra*, and should not be disturbed by this Court.

## **CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

-24-

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen                    
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 15, 2016

CERTIFICATE OF SERVICE

I hereby certify on July 15, 2016 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants July 15, 2016.

s/Carolyn M. Ciesla                    
Case Manager for the
Honorable R. Steven Whalen